J-A04032-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: A.N.H., MINOR CHILD | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.A.H., MOTHER | |
| | No. 2370 EDA 2016 |

Appeal from the Decree June 30, 2016
in the Court of Common Pleas of Bucks County
Domestic Relations at No.: 2014-A9129

| | |
|---|---|
| IN RE: L.A.H., MINOR CHILD | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.A.H., MOTHER | |
| | No. 2371 EDA 2016 |

Appeal from the Decree June 30, 2016
in the Court of Common Pleas of Bucks County
Domestic Relations at No.: 2014-A9130

| | |
|---|---|
| IN RE: S.N.H., MINOR CHILD | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.A.H., MOTHER | |
| | No. 2372 EDA 2016 |

J-A04032-17

Appeal from the Decree June 30, 2016
in the Court of Common Pleas of Bucks County
Domestic Relations at No.: 2014-A9032

IN RE: M.R.H., MINOR CHILD
 

APPEAL OF: T.A.H., MOTHER

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 2373 EDA 2016

Appeal from the Decree June 30, 2016
in the Court of Common Pleas of Bucks County
Domestic Relations at No.: 2014-A9128

IN RE: A.M.H., MINOR CHILD
 

APPEAL OF: T.A.H., MOTHER

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 2374 EDA 2016

Appeal from the Decree June 30, 2016
in the Court of Common Pleas of Bucks County
Domestic Relations at No.: 2014-A9127

BEFORE: SHOGAN, J., SOLANO, J., and PLATT, J.*

_____

* Retired Senior Judge assigned to the Superior Court.

- 2 -

MEMORANDUM BY PLATT, J.:                              **Filed April 25, 2017**

In these consolidated appeals,[1] T.A.H. (Mother), appeals from the decrees of the Court of Common Pleas of Bucks County (trial court), entered June 30, 2016, that terminated her parental rights to her children: A.M.H., born in January of 2007; M.R.H., born in December of 2007; A.N.H., born in December of 2008; L.A.H., born in November of 2011; and S.N.H., born in November of 2013 (Children).[2] We affirm on the basis of the trial court opinion.

The Bucks County Office of Children, Youth and Families (CYF) filed petitions to terminate Mother's and Father's parental rights to the Children on December 26, 2014 and March 27, 2015.[3] The trial court aptly summarized the events that led CYF to file those petitions in its September 13, 2016 opinion. We direct the reader to that opinion for the facts of these cases.

---

[1] This Court consolidated these appeals *sua sponte* on August 23, 2016.

[2] J.M.H., (Father), has also appealed the decrees of the trial court of June 30, 2016, which terminated his parental rights as to the same five Children. We address Father's appeal in a separate memorandum under Docket Nos. 2421, 2424, 2425, 2426, and 2427 EDA 2016.

[3] The December 26, 2014 petitions concerned A.M.H., M.R.H., A.N.H., and L.A.H. The March 27, 2015 petition concerned S.N.H.

The trial court held hearings on CYF's petitions on August 19, 2015, February 16, 2016, February 18, 2016, and March 11, 2016.[4] Testifying at those hearings, in addition to Mother, were CYS caseworker Desiree Mullen; the Children's maternal grandmother, D.D.; Lenape Valley Foundation caseworker, Deborah Hudson; Bucks County Counseling counselor, Richard Brown; Family Services Association parenting instructor, Joan Pfender; and Pastoral Counselor, Jill Klein.

The trial court entered its decrees terminating Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8) and (b) on June 30, 2016. Mother filed her notices of appeal and statements of errors complained of on appeal July 26, 2016. The trial court entered its opinion on September 13, 2016. **See** Pa.R.A.P. 1925.

Mother raises the following question on appeal:

A. [Were] the [trial c]ourt's [d]ecree[s] based on insufficient evidence and should [Mother's] parental rights not have been terminated[?]

(Mother's Brief, at 8).

_____

[4] The transcript of the hearing of March 11, 2016, is not part of the record. According to the trial court, it has been transcribed but it has not been entered in the record because Mother, although she ordered it, has not paid for the transcription. We have examined the record and we find that neither Mother, in her brief, nor the trial court, in its opinions, cite to the hearing of March 11, 2016. Accordingly, as it appears that nothing in the March 11, 2016 transcript is material to the claims of the parties, we have decided this matter without reference to it. **See Commonwealth v. Preston**, 904 A.2d 1, 7 (Pa. Super. 2006) (*en banc*) (appellate court is limited to considering only materials in certified record when resolving an issue) (citation omitted).

Our standard of review is as follows:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

The trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b). In order to affirm the termination of parental rights, this Court need only agree with any one subsection of Section 2511(a). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004).

Requests to have a natural parent's parental rights terminated are governed by 23 Pa.C.S.A. § 2511, which provides, in pertinent part:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(a)(2) and (b).

Here, the trial court concluded that termination was appropriate under Section 2511(a)(2). It is well settled that a party seeking termination of a parent's rights bears the burden of proving the grounds to so do by "clear and convincing evidence," a standard which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come

to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re T.F.*, 847 A.2d 738, 742 (Pa. Super. 2004) (citations omitted). Further,

> A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs. . . .

*In the Interest of K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citations omitted).

The Adoption Act provides that a trial court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The Act does not make specific reference to an evaluation of the bond between parent and child, but our case law requires the evaluation of any such bond. *See In re E.M.*, 620 A.2d 481, 485 (Pa. 1993). However, this Court has held that the trial court is not required by statute or precedent to order a formal bonding evaluation performed by an expert. *See In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa. Super. 2008).

We have examined the opinion entered by the trial court on September 13, 2016, in light of the record in this matter and are satisfied that the opinion provides a complete and correct analyses of Mother's claim. (*See* Trial Court Opinion, 9/13/16, at 22-27 (concluding that (1) Children have lacked proper parental care and control necessary for their well-being

and Mother has not and cannot remedy her parental incapacitating conditions within a reasonable period; (2) Children have been in care for six months or more and reasons for placement still exist; (3) Children have been in care for at least twelve months; and (4) record is devoid of evidence of beneficial relationship between Mother and Children which would be negatively impacted by termination of parental rights)).

Accordingly, we affirm the decrees of the Court of Common Pleas of Bucks County that terminated Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8) and (b) on the basis of the concise, thoughtful, and well-written opinion of the Honorable Gary B. Gilman.

Decrees affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/25/2017

**IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION**

| IN RE: | A.M.H. | : | NO.: | 2014-A9127 |
| | M.R.H. | : | | 2014-A9128 |
| | A.N.H. | : | | 2014-A9029 |
| | L.A.H. | : | | 2014-A9030 |
| | S.N.H. | : | | 2014-A9032 |

| INVOLUNTARY TERMINATION OF | : |
| PARENTAL RIGHTS OF T.A.H | : |

## OPINION

### I.    INTRODUCTION

T.A.H. (hereinafter "Appellant" or "Mother") is the biological mother of A.M.H., M.R.H., A.N.H., L.A.H., and S.N.H. (hereinafter the "Children"). Mother has appealed to the Superior Court from our June 30, 2016 Decree granting the Petition filed by the Bucks County Children and Youth Social Services Agency (hereinafter referred to as the "Agency") to Involuntarily Terminate her Parental Rights.[1] Extensive evidentiary hearings were conducted on August 19, 2015, February 16, 2016, February 18, 2016 and March 11, 2016.[2]

### II.    BACKGROUND

The relevant facts and procedural history of this case are as follows: A.M.H., the first child, was born to Mother on January 20, 2007, M.R.H. was born to Mother eleven (11) months later, on December 22, 2007, A.N.H. was born to Mother on December 6, 2008, L.A.H. was born to Mother on November 19, 2011 and S.N.H., the fifth child involved in these proceedings, was born to Mother on November 8, 2013.

The Agency's initial interaction of what was to become more than a nine (9) year saga with the family occurred on January 31, 2007, when the first child was just eleven (11) days old. In March, 2008, the Agency removed the two oldest children from their parents' care. The

---

[1] J.M.H., "Father" has also appealed our Decree of June 30, 2016 which terminated his parental rights as to the same five (5) children. Father's appeal is addressed in a separate Opinion, filed with the Superior Court under docket 2421 EDA 2016.

[2] Due to an extended personal emergency for one of the attorneys, the originally scheduled, earlier continuation of the first evidentiary hearing had to be cancelled and rescheduled months later.

38

Children stayed in the custody of their paternal grandparents for three (3) months before being returned to their parents. In April, 2009, the three oldest children were removed from their parents' custody by Bucks County Dependency Court. They were placed in foster care with their maternal grandmother, Dolores Duvak. The Children were returned to their parents in October, 2009, but were removed again by Dependency Court in August, 2010, when they were returned to their maternal grandmother's care. The Children returned to their parents in April, 2011. In February, 2013, fifteen (15) months after the fourth child had been born, all of the Children were again removed from their parents' care. The fifth child was removed from her parents' care on December 18, 2013, less than six (6) weeks after she was born.

As of the present time, all five (5) children have remained in the care of their maternal grandmother for an extensive time period. All five children have been adjudicated dependent. In March 2014, the placement goal for the four oldest children was changed by Dependency Court from reunification to adoption, and on March 6, 2015, Dependency Court changed the placement goal from reunification to adoption for the fifth child. On December 26, 2014, the Agency filed Petitions as to the four oldest Children, seeking to Terminate Parental Rights as to Mother pursuant to 23 Pa. C.S. §2511 (a) (2), (5), and (8). On March 27, 2015, the Agency filed a Petition regarding the youngest child, seeking to Terminate Parental Rights as to Mother pursuant to 23 Pa. C.S. §2511 (a) (2), (5), and (8). The multiple evidentiary hearings addressed the termination petitions as to all five children.

## III. APPELLANT'S STATEMENT OF ERRORS COMPLAINED OF ON APPEAL

Appellant filed timely Notices of Appeal on July 26, 2016.[3] The Notices of Appeal were accompanied by Concise Statements of Errors Complained of on Appeal pursuant to Pa. R.A.P. 1925 (a) (2), which we repeat, *verbatim,* as follows:

> 1. The Court's decision was based on insufficient evidence and the parent's rights should not have been terminated.

---

[3] The Notice of Appeal filed regarding each child is identical. No facts were elicited during the hearings which warrant separate Opinions by this Court. Therefore, we provide one Opinion regarding the Termination of Mother's Parental Rights as to all five (5) children. On August 23, 2016, the Superior Court, *sua sponte*, consolidated the appeals as to all five (5) children under docket number 2370 EDA 2016.

2

2. And any other issues that may arise after receiving the hearing transcript.

No issues have been raised by Appellant other than sufficiency of the evidence.

## IV.    STANDARD OF REVIEW

In cases involving termination of parental rights and an appeal from a decree of the trial court, the standard of review employed by the appellate courts is limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, the Superior Court must accord the hearing judge's decision the same deference that would be given to a jury verdict. The Superior Court must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence. In re A.R., 125 A.3d 420, 422 (Pa.Super. 2015)(internal citations and quotations omitted).

"The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." In re M.G., 855 A.2d 68, 73–74 (Pa.Super. 2004). If competent evidence supports the trial court's findings, the Superior Court will affirm even if the record could also support the opposite result. In re A.R., 125 A.3d at 422.

## V.    DISCUSSION

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101–2938, which requires a bifurcated analysis, as follows:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the

3

standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re Adoption of C.D.R., 111 A.3d 1212, 1215 (Pa.Super. 2015) citing In re L.M., 923 A.2d 505, 511 (Pa.Super.2007) (citations omitted).

Here the Agency pursued termination pursuant to §2511 (a) (2), (5), and (8), which provide in pertinent part, as follows:

(a)    General rule. – The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

    (2)  The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

    (5)  The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

    (8)  The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

As the party seeking termination, the Agency bore the burden of establishing by clear and convincing evidence that grounds existed for terminating Mother's parental rights. Clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. In re Z.P. 994 A.2d 1108, 1115-1116. (Pa. Super. 2010) (internal citations omitted).

"[T]he complete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take, carrying with it great emotional impact for the parent and the

4

child." In re C.P. 901 A.2d 516, 520 (Pa. Super. 2006). "Because of the importance placed on the family unit, governmental intrusion into the family, and disruption of the parent-child relationship, is warranted only in exceptional circumstances," and "only upon a showing of clear necessity." Even when such intrusion is necessary to protect the children, every possible effort must be made to reunite the family. In addition, all circumstances must be considered when analyzing a parent's performance or non-performance of parental obligations. A parent's performance must be measured "in light of what would be expected of someone in similar circumstances." In re G.P.-R., 851 A.2d 967, 977 (Pa. Super. 2004) (internal citations omitted).

In reaching a decision following a termination proceeding, the trial court's initial focus is on the conduct of the parent and whether his or her conduct justifies termination of parental rights pursuant to the pertinent statutory provisions. In re C.L.G., 956 A.2d 999, 1004 (Pa. Super. 2008) (internal citations omitted). Only if the statutory grounds for termination are established, pursuant to §2511 (a), does the welfare of the child become the court's paramount consideration, and the court must reflect on whether termination will best serve the child, focusing on the developmental, physical, and emotional needs and welfare of the child. Id.

Following four (4) days of hearings and upon carefully considering all of the testimony and evidence presented, we determined that the Agency met its burden of demonstrating clear and convincing evidence in support of the termination of Mother's parental rights.

The following pertinent facts were developed during the extensive evidentiary hearings held in this matter.

## A.     Mother is unable to adequately parent the Children due to her continued abuse of alcohol and prescription medications

At the evidentiary hearings, Desiree Mullen, a supervisor in the intensive services unit of the Agency, testified that she was familiar with the Agency's records regarding this family, and she has been involved as the caseworker for the parents and Children since August 2013. Ms. Mullen continued as this family's caseworker even after she transitioned, in June 2015, to a supervisory capacity within the Agency. (N.T. 8/19/15, pp. 5-6; 2/16/16, p. 10).

5

Ms. Mullen explained that the Agency first became involved on January 31, 2007, when the first born of the parents' five children was only 11 days old. Since that time, the Agency has been consistently involved with the family. (N.T. 8/19/15, p. 6; 2/26/16, p. 92). Ms. Mullen testified that some of the issues which initially prompted the Agency's involvement included Mother's alcoholism, ongoing domestic violence between the parents, and issues regarding Father's substance abuse. (N.T. 8/19/15, pp. 6-7).

Ms. Mullen testified that when the Agency first opened its case with this family, Mother acknowledged that she had a problem with alcohol. (N.T. 8/19/15, pp. 17-18). However, Mother became inconsistent in her acknowledgement of her issues, and she minimized her substance abuse on occasions when she was found to be intoxicated. (N.T. 8/19/15, p. 18). While Mother has occasionally attained some degree of compliance with Agency objectives listed on her various permanency placement plans over the years, Ms. Mullen explained that the Agency maintained significant concerns about Mother's continued alcohol consumption. (N.T. 8/19/15, p. 18).

Based upon the record established at the evidentiary hearings, we provide the following chronicle of incidences documented by the Agency which clearly and convincingly evidenced Mother's continuing abuse of alcohol, and her inability to provide her children a stable and secure environment.

On December 18, 2013, the day that the youngest child was removed from the parents' home and joined her four older siblings in the foster care of maternal grandmother, Ms. Mullen "received several calls, several calls of concerning reports." (N.T. 8/19/15, pp. 28, 89). Those reports prompted Ms. Mullen to visit the home, accompanied by officers from the Perkasie Police Department. (N.T. 8/19/15, p. 28). Ms. Mullin testified as to the events of December 18, 2013, as follows:

> What I found is that [Mother] was in the home with all of the lights out in the home and she was coming to the door looking out and appeared her eyes were half open, her gait was not steady, and she initially was not seeming to notice that we were standing right there and looking right at her.

6

At one point the dispatch at the Perkasie Police Department stated that [Mother] was calling the police, saying people keep knocking to [sic] my front door, but [Mother] could not tell them what her address was.

And eventually [Mother] came to the door and started interacting with me because I had asked if I could come into the home to be able to see her and see [S.N.H.] because there were concerns in regards to her being intoxicated.

\* \* \*

Her demeanor was she was combative, argumentative. She was slurring her words. At one point she fell. She stated that she was not going to let me come into the home. That her lawyer had instructed her not to allow me to come into the home. She was—she was not cooperative.

\* \* \*

…[Mother] met with me on her couch and kept stating that she hadn't been drinking. She'd only taken two Ativan.

I asked her if she would produce the Ativan prescription and she kept looking in her purse and then asked me and - - also during this time [Father's] mother had shown up at the house - - and asking us if we knew where the prescription bottle was. [Mother] appeared under the influence during the entire home visit.

(N.T. 8/19/15, pp. 28-30)

Based on Ms. Mullen's report to the Agency regarding Mother's condition, the Agency obtained an emergency order and in response, Ms. Mullen left the home with the youngest child, S.N.H, that evening. S.N.H. was placed in the custody of the Agency.[4] The Agency subsequently obtained a dependency order for S.N.H., who was placed with her four older siblings in the care of their maternal grandmother. (N.T. 8/19/15, p. 32). While S.N.H. was removed from the home, Mother was involuntarily committed to Grand View Hospital pursuant to Section 302 of the Mental Health Procedures Act.[5] (N.T. 8/19/15, p. 31). Mother was transferred from the hospital to Brooke Glen, an inpatient psychiatric facility, where she remained from December 19, 2013 through December 22, 2013. (N.T. 8/19/15, pp. 32, 92-93). Per Ms. Mullen, "[Mother] participated in mental health treatment on multiple occasions throughout the years that the Agency has had the case." (N.T. 8/19/15, p. 94).

---

[4] The Child Protective Services report from that date alleged that Mother fell with S.N.H. in her arms. (N.T. 8/19/15, p. 90).
[5] 50 P.S. §7101, et seq.

7

When Ms. Mullen spoke with Father late that night and informed him of S.N.H.'s emergency placement, Father described the circumstances that have continued to plague the family. He described Mother's continuous abuse of alcohol, indicating that she had been drinking "Captain Morgan" that day. (N.T. 8/19/15, pp. 33, 91-92). Father had previously reported Mother's alcohol use and abuse to the Agency on many occasions. (N.T. 8/19/15, p. 33).

Despite Mother's contention that she had not consumed alcohol since the December 2013 incident, Ms. Mullen testified about another occasion, May 2, 2014, when the Agency received a report about Mother allegedly using alcohol from the child visitation worker, Kim Barnett of Bethanna, who was supervising a visit between the parents and their children. (N.T. 8/19/15, pp. 33-35, 38). Upon receiving that report, Ms. Mullen reached Mother by telephone at approximately 5:00 p.m. and attempted to direct Mother to a "drug screen" which would show the presence of drugs or alcohol in Mother's system. (N.T. 8/19/15, p. 36). Mother's response was that she did not have time, and she hung up the phone. (N.T. 8/19/15, p. 36). Ms. Mullen testified that she redialed Mother's cell phone number three (3) times. She then tried the telephone number to Mother's office, which was a location where the supervised child visitations occasionally occurred, as Ms. Mullen was not aware of the scheduled location for the visit which was occurring that day. (N.T. 8/19/15, pp. 36-38).

Ms. Mullen left a message on the business phone, requesting Mother to contact her immediately. Mother did not return Ms. Mullen's call, whereupon Ms. Mullen called Mother's cell phone number an additional time. (N.T. 8/19/15, p. 38). At 5:36 p.m. Ms. Mullen reached Ms. Barnett's cell phone and as the visitation was still underway, Ms. Barnett passed her own cell phone to Mother so that Mother could speak with Ms. Mullen. (N.T. 8/19/15, p. 38). Mother was directed to submit to drug screen at Quest Diagnostics in Langhorne, Pennsylvania due to the extended hours of operation at that location, which was open until 7 p.m. (N.T. 8/19/15, pp. 38-41). At 7:23 p.m. Mother texted Ms. Mullen that she had arrived at Quest and that the

8

laboratory was closed.[6] (N.T. 8/19/15, pp. 41, 85). Mother submitted herself for a test the following morning, wherein the results were negative. Those results were not surprising to the Agency, given the extended time which elapsed time between the drug screen being performed and the concern as to Mother's alcohol consumption which had been raised the previous evening. As noted by Ms. Mullen, "Alcohol is a very short metabolic- - it leaves the body very quickly.")(N.T. 8/19/15, pp. 41-42, 96-97). As Ms. Mullen also testified:

> [Mother] is fully aware of the implications of her not complying with the drug test from the Agency, considering we have an eight-year-long history with concerns for her being under the influence of alcohol. And so for her to hang up on me and not pick up my subsequent calls, called for a lot of concern for me, and delayed the process for her to being able to get to Quest on time.

(N.T. 8/19/15, pp. 76-77, 80-81).

Ms. Mullen testified credibly as to this May 2, 2014 incident. While the testimony revealed that one of the children was crying when Mother abruptly ended her phone call with Ms. Mullen, Ms. Barnett and Father remained available to tend to the Children. We are persuaded that Mother intentionally avoided a prompt drug/alcohol screen by claiming she was tending to the child, and by appearing at Quest Diagnostics after closing time.

On May 6, 2014, when Ms. Mullen visited the parents at their home, the events of a few days earlier were discussed. Mother revealed to Ms. Mullen that she purchased a personal breathalyzer so that she would no longer be unfairly accused of being intoxicated or of smelling like alcohol. (N.T. 8/19/15, pp. 43, 99). In response, Ms. Mullen explained to Mother that self-reporting was not acceptable, and that her drug/alcohol testing needed to be conducted pursuant to Agency protocols. (N.T. 8/19/15, pp. 44, 100). "[T]he Agency has made clear over the last eight (8) years within the permanency plan that the Agency may request drug tests and there's the expectation that those drug tests be complied with because the issue of alcohol and drug abuse are so longstanding within this family's history." (N.T. 8/19/15 p. 100).

---

[6] We do not condone the Agency's disregard for the possibility that Mother was driving herself to a drug screen while she was under the influence of alcohol. We appreciate that since May 2014, the Agency has implemented practices which enable a caseworker to conduct an on-site swab test.

9

Ms. Mullen testified about a telephone conversation on June 10, 2014, at approximately 3:30 p.m., between Mother and her. During that conversation, Ms. Mullen became concerned that Mother was "under the influence. She was slurring her words, repeating herself over and over, her thoughts were tangential, she kept repeating things she had already told me..." (N.T. 8/19/15, p. 44). Ms. Mullen called Mother again, about thirty (30) minutes later, and requested that Mother submit to a drug/alcohol test that day. Ms. Mullen informed Mother that the Agency was providing transportation to the drug screening location. Somehow, this telephone call became disconnected. (N.T. 8/15/19, p. 44-46). Despite Ms. Mullen's immediate call back to Mother's number, Mother did not answer her phone. (N.T. 8/15/19, p. 46). Ms. Mullen then left a voice message and a text message for Mother, requesting that she contact Ms. Mullen to arrange transportation and present for a drug/alcohol test. (N.T. 8/15/19, p. 47). At 7:50 p.m. Ms. Mullen received a text message from Mother stating that she had left her phone on her counter and had not received Ms. Mullen's messages until sometime after they were delivered. Mother's text message asserted that she had contacted her attorney. (N.T. 8/15/19, p. 47).

On August 29, 2014, at noontime, after receiving messages about Mother being intoxicated, Ms. Mullen transported Mother to Quest Diagnostics in Harleysville, Pennsylvania. (N.T. 8/19/15, pp. 48, 118). Ms. Mullen testified that upon meeting Mother, Mother appeared to be "under the influence of a substance. She was slurring her words at times. She had an unsteady gait at times." (N.T. 8/19/15, p. 118). Ms. Mullen further described Mother's behavior as follows:

> Her demeanor was extremely out of character. She had a very deliberate speech pattern. She kept asking me questions I had answered multiple times as if she had never asked that question of me before. She was hyper-focused on who had...the Agency received a concerning call in regards to [Mother]. That was why I was asking her for a drug test.
>
> When we walked into Quest, she tripped and her phone, like, flew out of her hand. She was just acting strange to what I was used to [Mother] acting like. And she said that her lawyer told her...she shouldn't...submit to the test because she didn't have her ID on her. And it took [Mother] about two hours to submit to a urine sample.

(N.T. 8/19/15, p 48).

10

Despite being told not to use her cell phone while they were at Quest, Mother continued to use her phone. "[Mother] was taking measures to avoid taking the test." (N.T. 8/19/15, p. 118). Ms. Mullen testified that during her thirteen (13) years as a social worker for the Agency she has gained considerable expertise in discerning avoidance behaviors as follows:

> ...when people display behaviors of intoxication. And I have seen [Mother] intoxicated before, so I do have an indicator to make that judgment. And when people present in ways to try to avoid taking the test, I have a lot of experience with that in the Agency. And the behaviors I witnessed that day are behaviors I have seen other people try to avoid taking a test.

> \* \* \*

> I had met with [Mother], many, many times. I have seen her intoxicated. I have seen her not intoxicated. And her behavior that day was extremely concerning to me.

(N.T. 8/19/15, p. 119, 120)

Mother had told Ms. Mullen that she was taking Fioricet that day for migraine headaches. While the testimony elicited was insufficient to enable this Court to directly conclude that Mother was using her cell phone to search the internet for a medication, such as Fioricet, that she could claim to be the cause of the positive drug test that she anticipated, the record clearly supports the implication that Mother was engaging, yet again, in avoidance behavior. We found the circumstantial evidence sufficient to clearly and convincingly support such a determination.

The test results dated September 2, 2014 indicated that Mother had tested positive on August 29 for barbiturates, and negative for alcohol. (N.T. 8/19/15, pp. 49, 119). Ms. Mullen told Mother of her concern that Mother was taking more Fioricet than prescribed because it was causing her to act in an intoxicated fashion. Ms. Mullen observed that this was a strange effect on Mother's system, given Mother's claim that she had been taking the medication for years. (N.T.8/19/15, pp. 49-50, 119, 132). Mother stated that she would sign a release allowing Ms. Mullen to speak with Karen Badellino, the prescribing medical practitioner. Mother never signed that release. Instead, Mother provided a letter from Ms. Badellino, nurse practitioner, which listed Mother's prescribed medications. (N.T. 8/19/15, p. 130; Exhibit M-1). Ms. Mullen testified

11

credibly that Mother understood that a release, not a letter, was sought and was needed to afford an opportunity for dialogue between Ms. Mullen and Ms. Badellino. Mother knew that Ms. Mullen wanted to address Mother's behavior, specifically related to usage of Fioricet, and Mother's history with alcohol abuse. (N.T. 8/19/15, p. 132). In September 2014, Mother changed her primary care physician and Ms. Mullen was never permitted to speak with Ms. Badellino. (N.T. 8/19/15, pp. 50, 122, 124-127). This constituted additional avoidance behavior by Mother.

On September 26, 2014, Mother informed Ms. Mullen that four (4) days prior, on September 22nd, she had been prescribed a seven (7) day quantity of Norco, an opioid pain medication. (N.T. 8/19/15, p. 51). When Ms. Mullen asked Mother to count how many pills were remaining, [Mother] stated that she had thrown the pills away. (N.T. 8/19/15, pp. 51-52, 123). Mother's excuse did not have the ring of a truthful statement.

On October 22, 2014, at approximately 7:00 p.m., after having received reports about Mother's condition, Ms. Mullen, along with another Agency worker, presented for an unannounced visit at Mother's home. (N.T. 8/19/15, p. 52). Ms. Mullen requested that Mother complete a swab test at that time. Despite explaining to Mother that the Agency would consider her refusal to submit to the test as a positive result, Mother continued to state that she was not refusing, but she claimed that she did not feel well, and she stated that she did not want Ms. Mullen and the other worker in her home. (N.T. 8/19/15, pp. 52-53, 141). Ms. Mullen estimated that they left the home at 7:20 p.m.. Although it had never been stated to her while she was in the home, ten (10) minutes later, Father left a message on Ms. Mullen's office phone stating that Mother was "on a bunch of flu medication." (N.T. 8/19/15, p. 144). Despite her cell phone being the typical means of communication between Mother and her, the next morning Ms. Mullen retrieved a message from her office telephone which Mother had left at 7:46 p.m. the night before. Mother stated that she had just stepped outside her home, looking for Ms. Mullen, who was "nowhere to be found," and she asked Ms. Mullen to return to her home to perform the drug test. (N.T. 8/19/15, pp. 54, 144-146). Due to Mother's repeated requests for her to leave, Ms.

12

Mullen had just departed Mother's home a short time earlier, and she was not in her office later in the evening. (N.T. 8/19/15, p. 55). We found Ms. Mullen's testimony to be credible that she would have returned to Mother's home had Mother called her cell phone. Mother's behavior was manipulative, deceptive, and disturbing.

On October 29, 2014, Ms. Mullen received several reports that Mother appeared inebriated, was slurring her words, and was speaking repetitively. (N.T. 8/19/15, pp. 149-150).[7] On that day, although Father and Tammi Ashford from Bethanna, were present, Mother failed to appear for her visit with the children. That absence prompted Ms. Mullen to visit Mother at her home, arriving there at approximately 8:00 p.m. that evening. (N.T. 8/19/15, pp. 55-56, 149). Ms. Mullen testified that there were no cars parked in the driveway, and that no one answered her knocks on the door of Mother's home. Ms. Mullen drove to Mother's nearby office, but did not find Mother there. (N.T. 8/19/15, p. 56). Upon returning to Mother's home, Ms. Mullen observed a surveillance camera on the front porch. She had never seen the camera during her prior visits to the home. Ms. Mullen noted that just one week prior she had appeared unannounced at the home to conduct a swab test after receiving messages about Mother being intoxicated. Ms. Mullen contemplated whether this camera, which permitted Mother to observe who was at the front door from inside the home, was Mother's latest maneuver to avoid accountability to the Agency. (N.T. 8/19/15, pp. 57, 142, 153). We found Ms. Mullen's assessment to be reasonable and consistent with Mother's avoidance behaviors designed to hamper the Agency's ability to monitor her conduct.

Ms. Mullen testified about a text message she received from Father, which she read at 7:00 a.m. on December 15, 2014. Her phone indicated that the message had been sent to her six (6) hours earlier, at 1:00 a.m. (N.T. 8/19/15, p. 58). The text message read: "Please be here in the morning 7 a.m. [Mother] is drinking and going crazy. Threatening me and herself that she is going to kill herself. She has also been taking pain medication and no [sic] trying to cancel my

---

[7] While reporting sources are confidential in child protective services cases, as this is not such a case, Ms. Mullen was not precluded from revealing that a therapist who was familiar with Mother from family counseling was one of the reporters who described Mother's condition on that date. (N.T. 8/19/15, pp. 94, 150).

13

insurance because I can't get anymore. Please help." That text message prompted Ms. Mullen to visit the home that day. Upon her arrival, Father asked to speak with her privately. Father explained that he had not called the police because Mother monitors his cell phone usage. Believing it was an easier way to communicate without Mother's awareness, he contacted Ms. Mullen via text. (N.T. 8/19/15, pp. 59, 154-155). Father explained that Mother had been drinking beer the night before, was suicidal, and was aggressive toward him. (N.T. 8/19/15, p. 58). Father believed that Mother had been taking his prescription pain medication, because his medication bottles were empty before the prescription was due to be refilled. (N.T. 8/19/15, pp. 60, 156). Ms. Mullen did not have a usable swab kit with her during that visit to the home, and was therefore unable to perform a drug or alcohol test on Mother.[8] (N.T. 8/19/15, pp. 106-108, 155-156).

On December 22, 2014, when speaking with Mother about the above-noted incident of December 15, 2014, Mother denied that she had been drinking. Rather, she alleged that Father had been misusing his own prescription medications. (N.T. 8/19/15, pp. 60, 157).

Tammy Ashford, an Agency caseworker, testified that on February 20, 2015, Mother called her at 2:24 p.m. and cancelled a scheduled visit with the Children. Mother explained to Ms. Ashford that she had "so much going on" that she was going to inform the Children of "what's going on" and that she "had enough."[9] Mother did not provide any explanation as to why Father could not attend the scheduled visit. (N.T. 8/19/15, pp. 61-62; 2/16/16, p. 178). Ms. Ashford described Mother's speech as erratic and repetitive, and so slurred that "at one point (she) really couldn't understand." (N.T. 2/16/16, p. 178).

Ms. Duvak explained that she spoke with Mother (her daughter) on the phone between 5:30 p.m. and 6:30 p.m. on February 20, 2015, and that Mother "sounded inebriated. She

---

[8] Ms. Mullen testified that earlier in 2014, the Agency had begun using portable swab kits to test individuals and eliminate the need to travel to a drug screen facility. A swab is placed in the individual's mouth and collects enough saliva to render a testable sample. A blue indicator appears when a proper sample is achieved. In this instance, the blue indicator never appeared. Ms. Mullen testified it was her first experience with a swab kit which was defective. She did not have a second kit with her on that occasion. (N.T. 8/19/15, pp. 107-109).

[9] Ms. Ashford explained that her written reports, which caseworkers are required to submit to the Agency, include times as documented on a cell phone. (N.T. 2/16/16, pp. 183-184). The record never established what was "going on" which prompted Mother to cancel the visit.

14

sounded drunk. She was slurring her speech, over-enunciating again her words, repetitive and vague when I asked her 'Where are you?' She would not tell me where she was." (N.T. 2/18/16, p. 15).

After receiving concerning messages from Ms. Ashford about her exchange with Mother on that date, Ms. Mullen proceeded to Mother's home. (N.T. 8/19/15, pp. 61-62). Ms. Mullen found no one at the home, and she was unsuccessful in her efforts to leave voice messages on Mother's cell phone. Ms. Mullen left a message on the home voicemail system, and she also texted messages of concern to Mother's cell phone. Those messages were sent at approximately 3:45 p.m. (N.T. 8/19/15, pp. 61-62, 162). Between 7:30 p.m. and 7:41 p.m., Mother finally responded to Ms. Mullen with a series of unusual and cryptic text messages as follows:

> 7:30 p.m. "Are you there?"
>
> 7:36 p.m. "Not home. [Father] was not good. Can we meet first thing Monday or tomorrow?.l..I'm okay."
>
> 7:39 p.m. "[Father] is okay as well. We are okay. I need to talk, not now, but need to talk later. All good."
>
> 7:40 p.m. "I meant not feeling good for [Father]. We will talk.
>
> 7:41 p.m. "Still not know text is working. Problems with phone."

(N.T. 8/19/15, p. 63).

Ms. Mullen testified that since February 20, 2015, the Agency has discontinued its efforts to "catch" Mother under the influence due to an inability to expend additional resources in attempting to drug or alcohol test [Mother]. (N.T.8/19/15, pp. 70, 166). Ms. Mullen testified, "I felt like I was playing detective," in describing the Agency's continuous course of pursuing concerns raised to the Agency about Mother's unhealthy conduct, only to be confronted by Mother's repeated and calculated efforts to avoid being drug/alcohol tested. (N.T.8/19/15, pp. 70, 75). This Court does not support the Agency's decision to discontinue its efforts to have Mother submit to drug/alcohol screens at that time. We do, however, understand the Agency's position, following many years of Mother's calculated, deceptive behaviors, which frustrated

15

Agency efforts. We have concluded that even without continuing efforts to "catch" Mother since February 2015, the circumstantial evidence of Mother's ongoing drug and alcohol abuse is overwhelming.

The record reveals a concerted attempt by both parents to portray the Agency as biased and motivated by a vendetta against their reunification with Children. This theme includes the suggestion that Ms. Mullen's continued role as Agency caseworker for this family, even after being promoted to an Agency supervisor, was due to her desire to maintain some sort of vindictive campaign against these parents. Upon consideration of the testimony and evidence presented, we find Mother's assertion meritless.

Ms. Mullen testified credibly about the voluminous Agency files regarding these parents, which are the result of a long history between the Agency and this family. Ms. Mullen was promoted in June 2015 and the termination hearing was originally scheduled to begin in August 2015. She had already begun preliminary preparations for the hearing. Additionally, it would have been unfair and perhaps unreasonable, to expect a newly assigned caseworker to become sufficiently familiar with this complex case as of the time it was scheduled for court. (N.T. 2/16/16, pp. 107-109). We found Ms. Mullen's testimony credible, and her efforts here demonstrated an admirable work-ethic. The record overwhelming evidences that Mother's continuing and longstanding improper conduct, not Ms. Mullen's conduct, has thwarted any reasonable opportunity for Mother's reunification with Children during the past several years.

**B.** **The continued instability of Mother and Father's relationship, and the resulting impact on the household, render Mother unable to adequately parent the Children**

    **1.** **History of domestic violence and turbulence on the part of both parents**

Since January 31, 2007, when the Agency first became involved with this family, Mother and Father have exhibited an unstable and erratic relationship. The record is replete with testimony of recurring accusations of domestic violence between these parents. (N.T. 8/19/15, pp. 6-7, 9). Per caseworker Mullen, "Both parents have reported domestic violence from the other partner." (N.T. 8/19/15, p. 25; 2/16/16, pp. 79-80, 93).

16

Ms. Mullen testified that Father has never filed for protection pursuant to the Protection from Abuse Act ("PFA") and although, on several occasions since 2007, Mother has stated that she was going to file under the Act, she has apparently never actually done so. (N.T. 8/19/15, pp. 25-26, 93). On February 4, 2008, Mother informed the Agency that she was filing a PFA petition against Father, naming the two oldest children, and filing for divorce. (N.T. 2/16/16, pp. 93, 125-126). The next day she informed the Agency that she was not filing the PFA petition. (N.T. 2/16/16, p. 93).

Following a re-escalation of domestic issues in May 2010, the police were again called to the home on June 25, 2010. Mother was intoxicated, per a .169 breathalyzer test result, and Father accused Mother of hitting him. (N.T. 2/16/16/, p. 98).

On September 15, 2010, Mother informed an Agency caseworker that she had filed a PFA petition against Father, despite stating that there had been no physical altercation between them, and she stated that she would be back in court the next morning to appear before a Judge. The next day Mother reported to the Agency that she and Father were attending marriage counseling and that she was not pursuing the PFA petition. (N.T. 2/16/16, p. 130).

On many occasions police have been called to the home of Mother and Father. The Agency has a longstanding concern about the parents' "inability to be able to deal with conflict without it spilling over into the community." (N.T. 8/19/15, p. 113). The record is replete with examples of each parent having informed the Agency of the other's blameworthy conduct. Father has repeatedly informed the Agency that he wanted to leave the relationship due to Mother's abuse of drugs and alcohol, and/or due to her controlling behaviors which caused him to feel "trapped."

## 2. Mother's inability to remain compliant with reasonable Agency objectives

Mother has exhibited a prolonged pattern of compliance followed by noncompliance with the Agency's reasonable objectives. Following the March 2008 adjudication of dependency as to the first two children, Mother was to participate in drug and alcohol treatment, and submit

17

to a mental health evaluation. Both parents were to participate in parenting education as well as marriage counseling. Mother and Father met those objectives at that time, and Court supervision was terminated on March 6, 2009. (N.T. 2/16/16, pp. 95-96). Court supervision had to be reinstituted just six (6) days later, on March 12, 2009, following Father's report of Mother being intoxicated, Mother stating Father was addicted to ephedrine pills, and Mother refusing a breathalyzer test to be administered by the police. (N.T. 2/16/16, pp. 95-96). Later that year, after meeting the Agency's objectives, the Children were returned to the parents on October 9, 2009. (N.T. 2/16/16/, p. 98).

Following the June 25, 2010 incident when the police were called to the home, and Mother was found to be intoxicated with a .169 blood alcohol level, and Father accused Mother of domestic violence, the Children were returned to the care of their grandmother, Ms. Duvak. Ms. Mullen explained that the Agency's objectives for the parents to again regain custody included "that both parents participate in drug and alcohol evaluations and treatment, participate in Outreach Services, which is kind of a drug and alcohol support person for people that have addiction issues, and also participate in Lutheran Reunification Services." (N.T. 2/16/16, pp. 98-99).

As noted previously, Mother was frequently and increasingly uncooperative with and/or unresponsive to the Agency as the years progressed. In November 2014, Mother informed Ms. Mullen that she no longer had voicemail on her cell phone. In May 2015, Mother informed Ms. Mullen that she no longer had text messaging capabilities. (N.T. 2/16/16, p. 102). Ms. Mullen has at times been forced to leave messages on Mother's office phone, despite a lack of confidentiality. (N.T. 2/16/16, p. 102). Ms. Mullen has also been frustrated in numerous efforts to contact Mother at her home, as illustrated by the October 2014 installation of a surveillance camera on Mother's front porch, which enabled Mother to pick and choose when she was willing to have interactions with Agency personnel at her home. (N.T. 2/16/16, p. 103).

18

### 3. The long-term instability of parents' relationship renders Mother unable to provide a secure environment for the Children

Mother informed the Agency on various occasions that she was divorcing Father and taking the children away from him. (N.T. 2/16/16, p. 124). Mother informed the agency she was filing for divorce in 2008, Father informed the Agency he was filing for divorce in 2009, and Mother informed the Agency of her intent to file for divorce in 2010. (N.T. 2/16/16, pp. 125-130).

The Agency has been concerned over the years with the parents' volatile marriage. The parents have misled the Agency as to the status of their relationship, and, on occasion, as to Father's living arrangements. There were periods when the parents claimed that Father was living with his parents, or in the office of Mother's business. The record revealed those claims were sometimes inaccurate. We heard credible testimony that the Agency was very concerned with parents' inaccurate and/or duplicitous representations as to the status of their relationship over the years.

This pattern has continued. Ultimately, in February 2015, parents' divorce was finalized. (N.T. 2/16/16, p. 130). However, Mother and Father continue to live together in Mother's home.[10] (N.T. 2/16/16, p. 131).

When detailing the lengthy history of domestic violence and family instability, Ms. Mullen's testimony was credible, compelling and convincing. While circumstantial in certain regards, when considered in totality, it has provided overwhelming evidence of Mother's inability to provide a safe and stable home for Children. (N.T. 2/16/18, pp. 110-111).

Ms. Duvak, maternal grandmother of the Children, testified that she has attempted to assist her daughter, the Children's Mother, "in so many ways" for approximately fifteen (15) years. Ms. Duvak continues to try to help Mother, who is now forty (40) years old. (N.T. 2/18/16, pp. 9-11). Ms. Duvak explained that she has been in Mother's presence when Mother has admitted to drinking in excess. On those occasions, "[Mother] is confused. She slurs her words. She is vague in answers, over-enunciates, and at times violent when she drinks." (N.T. 2/18/16,

---

[10] The marital home was and is solely owned by [Mother]. (N.T. 8/19/15, p. 26).

19

pp. 10-11). Ms. Duvak testified credibly that she loves her daughter despite their strained relationship, and that she wishes her daughter would stop drinking (N.T. 2/18/16, p. 44).

4.   **The testimony of various witnesses presented by Mother was unpersuasive as to her alleged sobriety, nor did it help establish alleged parental capacity**

At the February, 2016 evidentiary hearing, Mother presented the testimony of Deborah Hudson, a Pennsylvania licensed clinical social worker, who is employed as an out-patient therapist at Lenape Valley Foundation. (N.T. 2/18/16, pp. 60-61). Ms. Hudson, who appeared in Court without the benefit of her notes, which presumably would have assisted her memory and recollection of dates, testified that she first began meeting with Mother in January 2014, and that Mother has continued to attend therapy sessions. (N.T. 2/18/16, pp. 65, 74-75). She testified that her focus with Mother has been coping skills and distress tolerance. (N.T. 2/18/16, pp. 112-113). Ms. Hudson testified that she is not an expert in identifying or treating alcoholism. (N.T. 2/18/16, pp. 64-65). However, toward the end of 2015, she diagnosed Mother's "severe alcohol use disorder", which was reported at the time of Mother's intake at Lenape Valley, as having reached "full remission." (N.T. 2/18/16, pp. 76-77).

Ms. Hudson testified that she had no awareness of Mother's alleged continuing alcohol abuse, and she could not recall whether Ms. Mullen had informed her about the Agency's continuing concerns. She recalled that Mother informed her that the Agency had received reports about her intoxication, including reports made by Father. (N.T. 2/18/16, pp. 81-91, 97). Ms. Hudson testified that her opinion that Mother was not continuing to consume alcohol was based upon Mother's self-reporting that information to her. (N.T. 2/18/16, pp. 79-80, 93). As an outpatient therapist, Ms. Hudson testified that it is not her role to investigate whether or not what a client tells her is accurate. (N.T. 2/18/16, pp. 96, 99). She accepts "what they bring into treatment as being their truth," and she stated that she had no reason to believe Mother did not speak to her truthfully. (N.T. 2/18/16, pp. 98, 104).

Ms. Hudson confirmed that she informed Ms. Mullen that she had no concerns about Mother relapsing. Ms. Hudson admitted it would concern her to know that since 2013, there

20

have been allegations of Mother being intoxicated, and that Mother has refused drug/alcohol screens. (N.T. 2/18/16, p. 113).

This Court determined Ms. Hudson's opinion, while well-intended, to be unpersuasive as to Mother's severe alcohol use disorder being in "full remission" since December, 2013. We found it surprising and concerning that Ms. Hudson would summarily dismiss the real possibility that Mother had not accurately self-reported alcohol consumption to her.

Mother next presented the testimony of Richard Brown, a certified advanced drug and alcohol counselor at Bucks County Counseling, a state licensed outpatient treatment center. (N.T. 2/18/16, pp. 121-122, 140). Mr. Brown, whose testimony was impeded by a lack of written notes and less than accurate recollection, testified that he had initially become involved in Mother's care in mid-2013, and had last counseled her in May of 2015. (N.T. 2/18/16, pp. 123, 125). His focus with Mother was substance abuse and anger management. (N.T. 2/18/16, p. 123). Mr. Brown testified that his initial diagnosis of Mother was "alcohol dependence." (N.T. 2/18/16, pp. 125-126). On December 19, 2014 his diagnosis was changed to "full remission." (N.T. 2/18/16, p. 127). Mr. Brown testified that he does not always believe what his clients report to him, and that he will consider reports from outside sources. He then utilizes or relies upon the outside information as he sees fit, depending on the source. (N.T. 2/18/16, pp. 130-131).

Mr. Brown stated that he never observed Mother to be under the influence of alcohol. (N.T. 2/18/16, pp. 138-139). Mr. Brown was aware of the December 2013 incident, but was not aware of Mother's subsequent mental health hospitalization. (N.T. 2/18/16, pp. 140-141). On August 17, 2015, Mr. Brown provided the Agency with a letter stating that Mother's alcohol dependence was in "sustained remission." (N.T. 2/18/16, pp. 158-159). He acknowledged that he had never consulted with the Agency after he learned of Agency concerns about Mother's alcohol consumption. He accepted Mother's denial of alcohol consumption without further confirmation.

21

The weight to be given to expert testimony is for the trier of fact to determine. Freed v. Geisinger Med. Ctr., 5 A.3d 212, 216 (Pa. 2010). We found Mr. Brown's expert testimony, along with that of Ms. Hudson, unpersuasive and worthy of minimal weight, given their inconsistent recollections and their incomplete knowledge of or consideration of Mother's actual concerning behaviors with regard to her ongoing substance abuse.

Lois Pfender also testified on behalf of Mother. Ms. Pfender is employed by the Family Services Association of Bucks County. Following a referral by the Agency, she provided occasional services to Mother as a parent educator from March 2014 to December 2014. (N.T. 2/18/16, pp. 172, 177). "[W]e talked about basics. Sleep, nutrition, attachment, discipline, safety, dealing with stress, the child's self-esteem. I think we talked about potty-training a little bit. That type of basic parenting things." (N.T. 2/18/16, p. 174). Ms. Pfender testified that both parents completed the parenting sessions. (N.T. 2/18/16, pp. 174, 184).

We also heard the testimony of Jill Klein, who has a Master's Degree in Pastoral Counseling, and who counseled Mother and Father from August 2010 to May 2012. The "couples counseling" was "closed-out" in November 2014. Ms. Klein resumed counseling the parents in July 2015. She continues to provide them with counseling "depending on their schedule and my schedule, then the need, their need." (N.T. 2/18/16, pp. 188, 196). Ms. Klein testified that she has counseled the parents on marital issues such as trust and communication, and that the counseling issues between the parents have not changed since the parents divorced in February, 2015. (N.T. 2/18/16, pp. 188, 209). Significantly, Ms. Klein had no knowledge or information about the parents' alcohol or drug issues. (N.T. 2/18/16, p. 188).

C.    **Termination of Mother's Parental Rights Pursuant to §2511(a)**

Decisional law mandates that this Court evaluate the individual circumstances of a case, and consider all explanations offered by the parent facing termination of his or her parental rights when determining if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination. In re R.I.S. & A.I.S., 36 A.3d 567, 572 (Pa. 2011); In re

22

B.N.M. 856 A.2d 847, 856 (Pa. Super. 2004), appeal denied, 872 A.2d 1200 (Pa. 2005). We have undertaken this mandated evaluation with great care in this case.

Based on the evidence and testimony provided regarding Mother's circumstances, and in accordance with pertinent statutory law, we found that the record clearly and convincingly establishes that the Children have lacked proper parental care and control necessary for their well-being pursuant to §2511(a)(2). We also determined that Mother has not, cannot, and will not remedy those parental incapacitating conditions within a reasonable time period.

The Agency was able to clearly and convincingly establish, pursuant to §2511 (a)(5), that the Children have been in care for six (6) months or more, that the reasons for such placement continue to exist, and that those reasons are not likely to be remedied within a reasonable time. At the hearing on August 19, 2015, the Agency's Exhibit CY-1 was admitted into evidence. The Exhibit, a bar graph, was a compelling demonstration of the age, calculated by number of months, of each child as of that date, with computations of the respective number of months each child had been in the care of the parents versus in the care of the Agency. A.M.H. had been alive for one hundred three (103) months, had been in the care of his parents for fifty-six (56) months, and had been out of the care of his parents for forty-seven (47) months. M.R.H. had been alive for ninety-two (92) months, had been with his parents for forty-five (45) months, and had been in out-of-home placement for forty-seven (47) months. A.N.H. had been alive for eighty (80) months at that time. She had never been in the care of her paternal grandparents and had only been in the out-of-home care of her maternal grandmother. She had been with her parents for thirty-six (36) months and had been in the care of her grandmother for forty-four (44) months. As of the August 19th, 2015 hearing, L.N.H. had been alive for forty-five (45) months, had been in the care of her parents for fifteen (15) months, and had been in the care of her maternal grandmother for thirty (30) months. S.N.H. had been alive for twenty-one (21) months, had been in the care of her parents for one (1) month, and had been in the care of her maternal grandmother for twenty (20) months. (N.T. 8/19/15, pp. 12-16).

23

Finally, pursuant to §2511(a)(8), the Agency met its burden of demonstrating that the Children have been in its care for at least twelve (12) months, as placement with the Agency with respect to each child has been fully detailed, *infra*.[11]

Mother, as is her right, did not testify at any of the evidentiary hearings. Ms. Mullen's testimony represented to the Court that Mother has maintained that she has not consumed alcohol since December, 2013. However, upon consideration of the complete record, the testimony overwhelmingly indicated continued alcohol and drug abuse by Mother well beyond that date. Further, the record evidences that Mother has, in fact, become less compliant over time in submitting to drug and alcohol tests, providing medical releases, being transparent about her prescriptions, and being generally cooperative with the Agency since December, 2013.

While the Court was presented with circumstantial evidence as to some of Mother's inappropriate conduct since she claimed she stopped drinking in December, 2013, the extensive testimony and evidence as to Mother's continued consumption of alcohol, her abuse of prescription drugs, her pattern of making assertions about Father's drug abuse when she deemed it advisable to try to deflect attention from her own misconduct, the domestic violence and turbulence in the household, and the unstable status of the parents' marriage are all components of the totality of the circumstances which clearly and convincingly warrant termination of Mother's parental rights. Ms. Duvak's heart-felt and credible testimony about the many, many years she has spent observing Mother's behavior, and especially her familiarity with Mother's temperament when Mother is intoxicated, buttressed the testimony and evidence on behalf the Agency's petition for termination.

## D.    Termination of Mother's Parental Rights Pursuant to §2511(b)

As the Agency clearly and convincingly established the criteria for termination set forth in 23 Pa.C.S.§2511(a)(2), (5), and (8),[12] this Court next examined, pursuant to §2511(b), whether

---

[11] Pursuant to § 2511 (a) (8 ), the Agency need not prove that the conditions leading to out-of-home placement cannot be remedied within a reasonable period of time.

[12] The Superior Court need only agree with the trial court's conclusions regarding any one subsection of § 2511(a) in order to affirm the termination of parental rights. In re S.C.B., 990 A.2d 762, 770 (Pa. Super. 2010).

24

upon consideration of the developmental, physical, and emotional needs and welfare of the Children, the termination of Mother's parental rights serves their best interests. We have concluded that the Agency clearly and convincingly established these criteria as well.

We heard credible testimony from and about Ms. Duvak, the maternal grandmother, who has been the foster parent to her grandchildren at various times during the past nine years, and consistently since February, 2013.[13] Ms. Duvak has maintained her willingness to be an adoptive resource for the Children. She is sixty-two (62) years old and is employed, full-time, as a certified registered nurse practitioner. At great sacrifice, she has willingly opened her heart and home to provide her five grandchildren with permanence and stability because their parents have not been able to do so. (N.T. 8/19/15, p. 73; 2/18/16, p. 7).

Ms. Mullen has observed the Children in Ms. Duvak's home. Ms. Mullen testified about the Children's loving bond with their grandmother, who has provided a stable home and normal routine to their lives. (N.T. 8/19/15, pp. 71-72). Ms. Mullen described how the Children love to eat dinner together with Ms. Duvak, how close the two oldest boys are, and how the younger girls follow right behind their older sister. She observed that the Children are healthy, happy and excelling in school. Ms. Mullen testified credibly that despite suggestions to the contrary by the parents, Ms. Duvak, at her age and stage in life, has no interest in "stealing" the Children from their parents and raising five (5) children, all of whom are less than ten (10) years of age. (N.T. 8/19/15, p. 73). It is only because the parents have not been able to safely provide for and protect the Children that Ms. Duvak decided to do what was best for the Children. She has been an ongoing resource for meeting their needs. (N.T. 8/19/15, pp. 72-73).

Based on the above, we found the evidence of the Children's substantial bond with their foster/maternal grandmother, to be clear and convincing.

When considering what situation would best serve a child's needs and welfare, the trial court must examine the status of the natural parental bond. In re Z.P., supra., 994 A.2d at

---

[13] As noted, one month after the youngest child was born in November, 2013, she was placed in the care of Ms. Duvak, where she has remained to this day.

1121. The Superior Court has described the bonding analysis required of the trial court as follows:

> When conducting a bonding analysis, the court is not required to use expert testimony. ..Social workers and caseworkers can offer evaluations as well... Additionally, Section 2511(b) does not require a formal bonding evaluation... "Above all else ... adequate consideration must be given to the needs and welfare of the child."... A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. ..
>
> Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the *intangible* dimension of the needs and welfare of a child—the love, comfort, security, and closeness— entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

Id. (internal citations omitted)

In this matter, this Court determined that termination was warranted. Mother has continued on an unstable, unpredictable roller coaster for at least nine (9) years while the Agency has been involved with this family. Ms. Duvak testified credibly that she has been trying to help her daughter resolve alcohol abuse issues for approximately sixteen (16) years. What is consistent, unfortunately, is Mother's volatile behavior regarding Father, the Agency, Ms. Duvak, and the police, all of which, as the evidence has indicated, has correlated to Mother's continuing periods of intoxication. The record is clear that for years Mother has maintained periods of compliance with Agency objectives and goals, but she is ultimately unable and/or unwilling to remain sober. The record is devoid of persuasive testimony or evidence of the existence of a necessary and beneficial relationship between Mother and the Children, the termination of which would result in a negative effect on the Children.

The record contains clear and convincing evidence that Mother is incapable of adequately parenting the Children. We do not doubt that Mother loves her Children. However, when her repeated failure to remedy her parental incapacity and her substantial noncompliance

26

with reasonable Agency objectives is balanced against the Children's need for permanence and stability, this Court has concluded that it would not be in the Children's best interests for their lives to remain on hold indefinitely, in hopes that Mother will one day be able to act responsibly and consistently as their parent. *See* In re Adoption of C.D.R., 111 A.3d 1212, 1220 (Pa. Super. 2015)(internal citations omitted). Regrettably, then, Mother is not entitled to relief.

## VI. CONCLUSION

For all of the reasons noted above, we respectfully submit that our Decree of June 30, 2016, granting the Agency's Petition to Involuntarily Terminate Mother's Parental Rights as to the Children, should be affirmed.

BY THE COURT:

9/13/16
Date

GARY B. GILMAN

**N.B.** It is your responsibility to notify all interested parties of the above action.

27

A copy of the attached Opinion has been sent to the following on the $\underline{13^{th}}$ day of September, 2016:

Brad Jackman, Esquire
JACKMAN LAW
107 North Broad Street
Doylestown, PA  18901
For the Agency

Keith Williams, Esquire
43 South Main St.
Doylestown, PA  18901
For Mother

Elissa Heinrichs, Esquire
CEVALLOS & WONG
94 Richboro Road
Newtown, PA  18940
For Father

Sarah E. Tucker, Esquire
Office of the Guardian ad litem
South Easton & Almshouse Roads
Doylestown, PA 18901
For Children